FILED
2007 Sep-28 PM 03:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
<u>EASTERN DIVISION</u>

| | |
|---|---|
| ALCURTIS CELESTINE, on behalf of himself and others similarly situated, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>RENT-A-CENTER, INC., )<br>)<br>Defendant. ) | CIVIL ACTION NO. 03-PWG-0190-E |
| CHRISTOPHER L. WOODS, on behalf of himself and others similarly situated, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>RENT-A-CENTER, INC., )<br>)<br>Defendant. ) | CIVIL ACTION NO. 03-PWG-1101-E |

<u>MEMORANDUM OF OPINION</u>

On January 28, 2003, Alcurtis Celestine, an African American, filed this action against Rent-A-Center, Inc., hereinafter referred to as "RAC," alleging race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981. The parties have consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c) and LR 73.2. This matter is before the court on RAC'S motion for summary judgment. (Doc. #56).

Summary judgment is appropriate only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Rule 56, *Federal Rules of Civil Procedure*. In

making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his *prima facie* entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be `no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [Citation omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

898 F.2d at 1532.

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because such cases involve issues of motivation and intent. See *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004). Rather, "the summary

judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale." 376 F.3d at 1086, quoting *Chapman v. AI Transport*, 229 F.3d 1012, 1026 (11th Cir. 2000).

The following relevant facts are undisputed or, if disputed, viewed in the light most favorable to as the non-moving party.  Alcurtis Celestine was hired as an account manager, the lowest level position, at RAC store #C66 in Georgia on July 10, 1999.  He had worked as an account manager for another rent-to-own company approximately eight months before he was hired by RAC.

On December 11, 1999, Celestine requested and was granted a transfer from Store #C66 to Store #451 in Talladega, Alabama. On December 4, 2000, Celestine was promoted to Inside/Outside Manager at Store #451.[1]  As the I/O manager, Celestine was responsible for the credit issues at the store and for overall performance and training of the account managers at the store.[2]

On April 11, 2002, Kealen Ogletree, Market Manager over store #451, completed a "Division 9 High Five Checklist" for store #451.  The checklist reviews whether a store is meeting RAC requirements and is following RAC procedures, including, but not limited to, staffing the store, sales, image of the store, customer processing, and account management.  The checklist for store #451 reflected that the account management was not being satisfactorily performed.  Ogletree did not indicate on the checklist whether the Caucasian store manager was working "15-plus accounts." Celestine admitted he failed to make the notes in the 15-plus files but stated it was because he was short-handed.

---

[1] Celestine was never promoted any further at RAC.

[2] Although Celestine further states that these responsibilities are store wide responsibilities, he provided no citation in support thereof.

On April 13, 2002, the store manager at the time, B.G. Simmons, reviewed the credit procedures for store #451 and noted that credit issues were not resolved. In mid-April, 2002, Simmons was terminated.

After Simmons's termination, Ogletree met with the employees of store #451 concerning the store's performance and RAC policy and procedure. Ogletree spoke directly with Celestine, reiterating RAC's expectations for Celestine as I/O manager. Ogletree recognized that Celestine was short-handed and did not have adequate staffing.

On April 15, 2000, Robert Lewis was transferred to store #451 as store manager. On April 16, 2002, Celestine went out to pick up merchandise from a past due customer. Celestine did not follow RAC's procedure during the pick-up and failed to retrieve all the merchandise. As a result, RAC had to charge off the lost merchandise.[3]

On April 22, 2002 Lewis counseled the employees at store #451 regarding their job duties. Celestine initialed the overview, indicating that he understood what was expected of him. That same day, Lewis received a complaint from a customer complaining that his new appliances – a refrigerator, washer, and stove – were damaged during Celestine's delivery of the items. Lewis met with the customer and examined the damaged merchandise. The customer told Lewis that Celestine broke the bottom of the refrigerator by kicking the shipping crate to remove the refrigerator from the crate instead of using the proper tools. The customer also told Lewis that the washer was too large to fit through the customer's back door. Rather than bring the washer around to the larger front door, Celestine forced the washer through the back door, denting and scratching the machine. A new

---

[3]/ Although Celestine indicates that RAC's statements regarding pick-up from the past due customer was controverted, the cited deposition testimony does not address this issue but relates to delivery of merchandise which is addressed later.

employee had accompanied Celestine on this delivery to learn proper RAC procedures for delivery as part of his training.[4]

On April 23, 2002, while reviewing the store's previous day's activities, Lewis discovered that Celestine had failed to perform any of the necessary credit procedures from the previous day. Lewis terminated Celestine for poor performance including failure to follow RAC instructions; failure to follow RAC policy and procedure; loss of RAC property; damage to new RAC property; and failure to train new account manager in proper RAC procedures. Celestine testified that Lewis told him he was fired because he hadn't made "any notes" or "enough notes" on the 15-plus files. (Celestine, 69, 71). Celestine asserts without citation to the record that he was provided no other basis for his termination. In April, 2002, Celestine was hired as a store manager in Rentway in Sylacauga. On May 27, 2002, Christopher Woods, African American, became I/O at store # 451, replacing Celestine.[5]

---

[4]    In deposition, Celestine was asked about the damaged merchandise:
   Q.   Do you remember damaging some merchandise at a customer's residence when you were delivering it on the weekend or within the week before you were terminated?
        ...
   A.   I'm trying to think. No, sir. I want to say I think I remember something about a refrigerator. I think Robert mentioned something about a refrigerator, or something.
   Q.   Do you recall what he said about a refrigerator?
   A.   He said a guy said something about a scratch on his refrigerator, or something. I can't recall everything.
   Q.   When did Robert tell you that?
   A.   Saturday. That was a Saturday.

   (Celestine, 77-78).

   This testimony does not dispute the fact that the appliances were damaged during delivery by Celestine and a new employee. Celestine's testimony indicates only that he does not "recall everything" beyond a scratch on the refrigerator.

[5]    Celestine attempts to dispute this statement by stating that Woods already worked at RAC and did not replace Celestine as a RAC employee. (Doc. #73, p. 10, ¶ 36). In Woods's case, a companion to this one (see separate memorandum of opinion), it is undisputed that Woods had been temporarily reclassified as an account manager A and transferred to Store #446 in Anniston in March 2002. When the I/O position became available at Store #451 in Talladega in May 2002, RAC offered the position to Woods and he was promoted to the I/O position

Celestine alleges that "Kevin _____.[6] Brandon Wade, Robert Lewis and Lynn Littlejohn and others" were promoted over African Americans with more seniority, experience and other qualifications. (Doc. #73, p.11, ¶ 5).

Celestine testified that while he was employed with RAC no set process for employees to apply for promotions was in place. (Celestine, 48). He testified that when he was promoted to IO he initiated a discussion with the store manager. (Celestine, 49). He testified that the only other specifically available position that he talked about with his store manger, B. G. Simmons, and his market manager, Regina Wilson, was the Anniston store manager job. (Celestine, 50-52).

Celestine submitted as exhibits 17 charges of discrimination by RAC employees or former employees – 13 of which were filed in 1999. He also submitted as exhibits five complaints in lawsuits – two of which were filed by RAC employees or former employees who were the complainants in the submitted charges of discrimination. In addition, he submitted the affidavit of James Smelcher, Caucasian, who stated in pertinent part:

> I worked for [RAC] between 2000 and 2004. I often heard members of management of [RAC] make many derogatory remarks about blacks.
>
> On one occasion, Dana Miller, the white store manager of the [RAC] store in Anniston, called me into his office and told me I needed to "talk more like a white man." He said I sounded like a black man on the phone to customers and that "is not what this company wanted." He showed me a picture from the [RAC] newsletter that had all white middle aged males in it and said this was the type of people the company liked. I heard Dana Miller on many occasions make racist jokes to other employees and management of [RAC].

---

at Store #451 on May 27, 2002. While Woods was a RAC employee at another store prior to his being the I/O manager at store #451, it is undisputed that the I/O position he filled at store #451 was the one previously filled by Celestine.

6/   Celestine refers to this alleged comparator in this fashion.

6

> Black males did not get promoted like they should have been. On many occasions I saw black males passed over for management positions and the job given to a white male. I was put over Chris Woods, who had been an Account Manager since about 2003 or 2004, into a Credit Manager position even though I had less seniority and experience.

(Smelcher affidavit, p.2).[7]

In his statement of disputed facts, Celestine presents a section entitled Rent-A-Center's Management's Other Conduct and Words Showing Racial Bias" (doc. #73, pp. 15-18 ¶ 31-47) which is clearly intended to show a "culture of racial inequality" at RAC.[8] He relies upon the deposition testimony of Lawrence Kahlden, a Caucasian former market manager, to establish that RAC Regional Director Roger Estep made racially discriminatory comments. Those statements that were not heard by Kahlden will not be considered on summary judgment.[9] Kahlden also related two comments by Estep that he interpreted as derogatory references toward black store employees. After seeing two black employees in one store, Estep told Kahlden "You can look at that and tell that there ain't no back up." (Kahlden, 37-38). Kahlden asked Estep what he thought about a long time store manager named Booker Graham, an African American. Estep said "Well, he is not bad, but he is not someone me and you would want to shoot pool with." (Kahlden, 38-89). Celestine referred to

---

[7] RAC points out that Woods testified that he "had a pretty open relationship" with Dana Miller and that the transfer to Miller's store "was a better situation in my eyes." (Woods, 111). RAC also correctly points out that Woods has not asserted that Smelcher received a promotion that Woods should have received.

[8] The "culture of inequality" quotation comes from Celestine's statement of disputed facts. (Doc. #73, p. 18, ¶ 46).

[9] Although Woods implies that Estep used the word "nigger" among Caucasian people in Kahlden's presence, Kahlden's testimony clearly states that he heard this from RAC managers that left RAC. (Kahlden, 137). A statement allegedly made by Estep referring to a former regional director as "nigger" and "ignorant" or "stupid" was not made in Kahlden's presence but was told to him by a former RAC manager. (Kahlden, 138-40). Another former RAC manager told Kahlden that Estep had told him several times to "get rid of Tasha, who was a black female, because they were in the country, and there were no black customers, and she was a female." (Kahlden, 62-63).

Woods's testimony that he was informed by other RAC Caucasian management that Estep made racial comments from time to time; however, Woods testified that he never heard Estep make any racial comments. (Woods, 303). Woods testified that James Smelcher said that Estep used racial slurs, but Smelcher would not tell Woods what the slurs were but "just said they were racial[ly] discriminatory statements." (Woods, 306). Significantly, Smelcher's affidavit does not refer to Estep. Woods testified that Bobby Hardin told him that Estep said "stuff that [was] not appropriate" but did not state specifically what Estep said. (Woods, 308). When asked if Hardin used the term "racial," Woods stated "He indicated that it was something I wouldn't like. That's all. And I assumed it was racial. And I know it was safe to assume that, based on the way he was acting."(Woods, 309).

Celestine has sought to introduce the deposition testimony of William Augustus Roberts in which Roberts refers to a racially derogatory statement made in 1999 by RAC President Dowell Arnett. RAC filed a Motion to Strike the Deposition Testimony of Roberts. (Doc. # 77). The motion is granted by separate order.

Woods testified that after telling RAC Manager Dana Miller that he wanted to be promoted Miller showed him a photograph of RAC executives and said "Do you look like any one of those?" When Woods responded "no," Miller said "Well, do you think you are going to be promoted up there?" (Woods, 138-39).

Celestine testified about a conversation that he had with Caucasian Tim Phillips about the store manager's position:

> A: He was basically saying that, in so many words he was like, well – because we was still stuck on him being the store manager. And he was, like, "Man," he was like, you know,

> "Who you is? It's like a stumbling block for you." you know, like that. **"It's all about who you know."** He said "Who you is, is like a stumbling block." You know, that's basically how he left that. It was like, "Wow."
>
> Q. Did you consider that to be a racial slur?
>
> A. Yes, because it don't matter who I am as long as I'm performing.
>
> Q. Again, tell me what his exact words were that you considered to be a racial slur.
>
> A. Who I am could be a stumbling block. To me, that's a reason why I won't be able to get ahead in the company, because of the color, is the way I took it. He's a young guy; he's a young white guy; and he's running the store.
>
> Q. Again, his comment was, "Who you are could be a stumbling block"?
>
> A. Yes.

(Celestine, 90-91) (emphasis added).[10]

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer…to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000(e)-2(a)(1). 42 U.S.C. § 1981(a) provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts,

---

10/ This is the only evidence of alleged racial bias of which Celestine purports to have personal knowledge. Contrary to Celestine's assertion, Phillips did not advise him "that Celestine's skin color was likely a stumbling block for him with regard to promotion at [RAC]" (Doc. #73, p. 18, ¶ 47). While Celestine interprets Phillips's statement to mean that Celestine would not be promoted to store manager because of his race, it could just as easily be interpreted precisely as phrased by Phillips – that RAC promotes based on **"who you know."** Celestine testified that when he asked Phillips how he got to be a store manager so young. He said "Mainly, like, **it's who you know with this company**." (Celestine, 49) (emphasis added).

> to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Title VII and § 1981 claims are analyzed in the same manner. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).[11]

ANALYTICAL FRAMEWORK

Celestine seeks to prove both his claims of race discrimination and retaliation with circumstantial evidence rather than direct evidence, thus invoking the burdenshifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under this framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *Combs v. Plantation Patterns*, 106 F.3d 1519 (11th Cir. 1997), *cert. denied,* 522 U.S. 1045 (1998). If he proves a *prima facie* case of discrimination, the burden shifts to the defendant employer to rebut the presumption of discrimination by articulating "a clear and reasonably specific" legitimate, non-discriminatory basis for its actions." *Burdine,* 450 U.S. at 254-55. An employer's burden to articulate a non-discriminatory reason for failing to promote an employee is a burden of production, not of persuasion. *Burdine,* 450 U.S. at 254. Because this burden involves no credibility determination, *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509 (1993), it is an "exceedingly light" burden. *Meeks v. Computer Associates, Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994); *Perryman v. Johnson*

---

[11]/ A § 1981 action does not require compliance with Title VII's administrative machinery as a prerequisite to a cause of action. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459-61, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). A § 1981 claim which requires proof of intentional discrimination may also be brought against an employer that does not satisfy the mandatory/minimum 15 employees engaged in an industry affecting commerce as required by 42 U.S.C. § 2000-2(a); Id., 511 U.S. at 303, n.3, 114 S.Ct. 1515 n.3, 128 L.Ed.2d 274 n.3.

*Prod. Co.,* 698 F.2d 1138, 1141 (11th Cir.1983).  After the employer discharges its burden, the burden shifts back to the plaintiff to show that the reason offered by the employer was a pretext for discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 804.  At the pretext stage, the court's concern is not whether the employment decisions are prudent or fair but whether unlawful discriminatory animus motivates the challenged employment decision.  *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1361 (11th Cir.1999), *cert. denied*, 529 U.S. 1109 (2000). To survive summary judgment, the employee must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were a pretext for discrimination. *Chapman v. AI Transport,*  229 F.3d 1012, 1024 (11th Cir. 2000). This evidence must reveal "such weaknesses, implausibilities, inconsistencies, incoherences or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Cooper v. Southern Co.,* 390 F.3d 695, 725 (11th Cir.2004), *cert. denied*,  546 U.S. 960 (2005).  The plaintiff may not simply quarrel with the wisdom of the reason proffered "but must meet it head on and rebut it." *Chapman* , 229 F.3d at 1030. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. "  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000).

> (A) Whether Rent-A-Center discriminated against Alcurtis Celestine
>     <u>based on his race when it terminated him on April 23, 2002</u>

To establish a *prima facie* case of race discrimination, a plaintiff must show:

> (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job.

*Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  See also, *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006).

RAC argues that Celestine cannot establish a *prima facie* case because there is no substantial evidence that RAC treated similarly situated white employees more favorably.  Celestine argues that "those working in his store at the time [ ] were not held to the standard to which Celestine was held." (Doc. #73, p.22, citing Celestine's statement of disputed facts, ¶¶ 18-20).[12]  Celestine argues that he has shown that he was treated differently than Caucasians such as Edwin, Katrinka, Lewis Forquette, Johnny Mathis, Crystal Dunn, Brandon Wade, "and several others."

> "In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Med. Ctr.,* 137 F.3d 1306, 1311 (11th Cir.) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)), *opinion modified by* 151 F.3d 1321 (11th Cir. 1998).  "The most important factors in the disciplinary context ... are the nature of the offenses committed and the nature of the punishments imposed." *Id*. (citations and quotations omitted).  In order to satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's in order "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *See Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999) (citation omitted); *see also Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor necessary, but the cases must be fair congeners.  In other words, apples should be compared to apples.").

*Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001), *cert. denied,* 534 U.S. 976 (2001).

---

[12]/   While Celestine has not stated specifically who these people were, it appears to be his position that making notes on 15-plus files was "primarily" the store manager's responsibility.  (Celestine, 71).

12

In his statement of disputed facts (doc. # 73, pp. 14-15, ¶ 21, 22, 23, 24, 25, 26, 30), Celestine identifies various Caucasian employees "in the same region" (doc. #73, p. 22) as comparators who were allegedly treated more favorably. Edwin was absent and late on multiple occasions and was being coached on his tardiness and excessive absences when he left and did not return. (Williams, 103-05). Katrinka was terminated due to an inventory control issue after a prior coaching form for inventory control issues. (Williams, 105-08). Lewis Forquette[13] was written up for not verifying order forms – that is, for not verifying the employer, the landlord and four personal references – resulting in charge-offs. (Williams 143-44, 163). Johnny Mathis was written up for not making the proper cash drops into the safe, resulting in more than $100 being left in the drawer, and for "not meeting standard deliveries." (Williams, 158-59). Crystal Dunn was put on a coaching form for letting her husband ride in the company truck she was driving. (Williams, 166-67). John Day, was counseled twice for not doing his inventories before he left the company. (Williams, 168-69). Brandon James Wade was a "no-call, no-show" on a Saturday and was not terminated after being caught attending a parade. (Celestine, 63-67).[14] These employees are not similarly situated due to the qualitative difference in their conduct and the conduct of Celestine. Unlike the above employees, Celestine had been told three times within a two week period what he was expected to do and failed to do so. Further, these alleged comparators were not similarly situated because while they worked in the same region, they did not work for the same store manager, Robert Lewis. or the same market manager, Kealen Ogletree. *Bessemer v. Carraway Medical Center*, 137 F.3d 1306, 1312 n.7 (11th

---

[13]/  Dietrich Williams testified that Forquette was African American. (Williams, 155). Celestine has not specifically alleged he was Caucasian.

[14]/  Despite Celestine's characterization of their actions as violations of direct orders, the employees violated company procedure – not direct orders. Woods, in the companion case, was terminated for violating a direct order. Celestine was not terminated for violating a direct order.

Cir.), *opinion modified by*, 151 F.3d 1321 (11th Cir. 1998) ("Different supervisors may have different management styles that – while not determinative – could account for the disparate disciplinary treatment that employees experience."); *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) ("Courts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis.")

"If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997).

Even assuming that Celestine has established a *prima facie* case of discrimination, RAC has stated a legitimate, nondiscriminatory reason for Celestine's termination. Specifically, RAC states that

> In less than one week, Lewis had witnessed Celestine fail to follow instructions, lose company property, damage company property and teach a new employee to violate company policy regarding deliveries–all after being specifically instructed by the Market Manager and two different Store Managers what was expected of him. Lewis terminated Celestine's employment for these reasons.

(Doc. #64, pp.15-16).

Celestine argues that the reasons given for his termination are pretext for discrimination. As evidence of such pretext, he states that he was not informed that he was being discharged for any reason other than his failure to make notes on his 15-plus accounts. He contends that the additional after-the-fact reasons for his termination are evidence of pretext and cites in support of his contention *Mock v. Bell Helicopter Textron, Inc.*, 196 Fed.Appx. 773 (11th Cir. 2006). In *Mock*, the employer refused, despite the employee's insistence, to provide the employee with **any** reason for its decision

to terminate him. Later, in a letter, the employer told the employee that he had been terminated for unacceptable performance. The Eleventh Circuit Court of Appeals held "[i]n light of Bell's refusal to tell Mock--at the time it fired him--why his employment had come to an end, a trier of fact reasonably could find that the letter constituted a pretext for discrimination."

In this case, RAC did not fail to provide Celestine with an explanation for his termination. He was clearly told that he was terminated for failing to make notes on his 15-plus files. At some point prior to his termination, Lewis also told him that he had damaged merchandise during a delivery but Celestine could not "recall everything" "about [a] refrigerator or something." (Celestine 77-78). Regardless, assuming that the only reason provided to Celestine at the time of his termination was his failure to make notes on 15-plus files, Celestine has failed to show that this reason was false inasmuch as he admitted that he had not made notes on the files albeit because he was allegedly shorthanded. A reason is not pretext for discrimination "unless it is shown both that the reason was false, and that discrimination was the real reason." *Hicks*, 509 U.S. at 515. Because he has failed to show that the reason was false, it is unnecessary for the court to address whether discrimination was the real reason.

In arguing that race can be inferred as a factor in his termination, Celestine relies on the evidence that he was treated differently than the previously identified Caucasian employees, the "evidence of racial bias, evidence of similar discriminatory conduct,[15] and evidence of falsification

---

[15]/ Celestine is apparently referring back to his statement of disputed fact "African American Darius Celestine was terminated for conduct which Caucasian Lynn Littlejohn also engaged in without suffering termination. (Doc. #73, p. 14-15, ¶ 27). Celestine testified that African American Darius Celestine (his cousin) was terminated for tardiness while Lynn Littlejohn was not terminated for tardiness. (Celestine, 28-31). Celestine later testified, however, that Darius Celestine "was written up and then later terminated." (Celestine, 106). He testified that Darius Celestine was written up for tardiness. (Celestine, 107). He does not cite to any testimony or other evidence that Littlejohn was not written up for his tardiness.

15

on the part of Defendant's witnesses with regard to the facts surrounding Mr. Celestine's termination." As previously noted, the identified employees were not similarly situated because they did not have the same supervisor. Celestine has failed to present sufficient evidence to permit a reasonable fact finder to conclude that the reason given by RAC was not the real reason for his termination.

Celestine relies upon the evidence of racial slurs and racial bias. Comments unrelated to a termination decision may contribute to a circumstantial case for pretext, see *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286 (11th Cir. 1998); however, such evidence will usually not be sufficient absent some additional evidence supporting a finding of pretext. See *Rojas v. Florida*, 285 F.3d 1339, 1443 (11th Cir. 2002). Here, there is no evidence that Estep, Arnette, Miller or Phillips played any roles in any employment decisions relating to Celestine. There is no evidence that Lewis, the decision maker, was aware of any racially discriminatory comments allegedly made by Estep, Arnette, Miller or Phillips. There is no evidence that Lewis ever made any racially discriminatory comments.

Celestine has not specifically argued that the EEOC charges and complaints in other lawsuits against RAC alleging race discrimination are evidence of pretext. In any event, the **charges and complaints** are not admissible to establish pretext. In the Eleventh Circuit, EEOC **determinations** are generally admissible in bench trials but not in jury trials. See, *Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1554 (11th Cir. 1995) *citing, Barfield v. Orange County*, 911 F.2d 644, 649 (11th Cir.1990) (listing cases), *cert. denied*, 500 U.S. 954 (1991). In *Walker*, the court noted that "Administrative findings regarding claims of discrimination are admissible in a trial *de novo* under Federal Rules of Evidence 803(8)(C), the public records and investigatory file exception to the

hearsay rule. *Chandler v. Roudebush*, 425 U.S. 840, 863 n. 39, 96 S.Ct. 1949, 1960-61 n. 39, 48 L.Ed.2d 416 (1976)." *Walker*, 53 F.3d at 1554, n. 7. Even though an EEOC determination is admissible in a bench trial, the court is not required to defer or make reference to the EEOC determination nor is it required to address EEOC findings; rather, the court must conduct a *de novo* review of the claims. *Moore v. Devine,* 767 F.2d 1541, 1549-51 (11th Cir.1985), *modified on reh'g,* 780 F.2d 1559, 1560 (11th Cir.1986) (clarifying that EEOC determinations for federal employees are different and may be binding on the courts). The court does not have before it any EEOC findings regarding race discrimination claims. The court concludes that Celestine has not raised a genuine issue of material fact regarding his Title VII and § 1981 claims of discrimination.

      (B)    Whether Rent-A-Center discriminated against Alcurtis Celestine based on [its failure to promote him to Store Manager and/or other management positions provided at various times to Caucasians <u>Lynn Littlejohn, Kevin [Jones], Brandon Wade, Robert Lewis and others.</u>

A plaintiff may establish a *prima facie* case of promotion discrimination by showing that: (1) he is a member of a protected minority; (2) he was qualified and applied for the promotion; (3) he was rejected despite these qualifications; and (4) the position was filled by someone outside the protected minority. *Vessels v. Atlanta Independent School System,* 408 F.3d 763, 768 (11th Cir. 2005); *Walker v. Mortham,* 158 F.3d 1177, 1185-87 (11th Cir.1998). To demonstrate that he was qualified for the position, a Title VII plaintiff need only show that he satisfied an employer's objective qualifications. *Vessels* , 408 F.3d at 769. A plaintiff is not required to prove as part of his *prima facie* case that he is more qualified than the successful applicant. *Walker*, 158 F.3d at 1189, relying on *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

Celestine alleges that "Kevin [Jones], Brandon Wade, Robert Lewis and Lynn Littlejohn and others" were promoted over African Americans with more seniority, experience and other qualifications. (Doc. #73, p.11, ¶ 5, citing to Celestine, 29, 49-52, 63-67, 69, 86-88, 93, 108-11).

Celestine's citations to the record indicate that Celestine inquired about only one promotion which he did not receive – the store manager position in Anniston. (Celestine, 50-51). According to RAC, Celestine expressed an interest in a vacant promotional opportunity at RAC on two occasions, the I/O job that he **was** awarded in December 2000 and a store manager position at store #1001. (Celestine, 42-43, 48). Although Celestine testified that he was delayed in his promotion to assistant store manager because Brandon Wade was promoted to sales IO ahead of him (Celestine, 109), it is undisputed that Celestine was not qualified for promotion to I/O in May 2000 because he had not completed the necessary testing and training. (Celestine, 43; Stanton Declaration, exhibits B and D).

Celestine testified that he spoke to Market Manager Regina Wilson about the store manager position in Anniston and told her that he "wouldn't mind taking the store and running it for her." (Celestine, 52). Wilson testified that Celestine made general remarks to her about whether she thought he was ready to manage a store, but she did not think he was applying for a specific vacancy. (Wilson Decl. ¶ 6). Kevin Jones was awarded the store manager position at store #1001 in December 2001. At the time he was awarded the position, he was working as an assistant store manager; however, he had prior experience as a store manager. (Wilson Decl. ¶ 6).

Celestine testified that Lynn Littlejohn was offered a job as store manager even though Celestine had more seniority and experience. (Celestine, 64-65, 86-88 , 92-93, 108). The record reflects that Celestine never applied for the position awarded to Littlejohn. More important and fatal

18

to Celestine's promotion claim, Celestine was terminated five months before Littlejohn was promoted to store manager on September 21, 2002 . (Stanton Decl., exhibit N).

Finally, Celestine complains that Robert Lewis was transferred from Georgia to become store manager at store #451 in April 2002. (Celestine, 69). Lewis had been working as a store manager for RAC since June 27, 2001. (Stanton Decl., Exhibit K).

Celestine has failed to establish a *prima facie* case with respect to his promotion claim because he did not apply for any of the positions that were subsequently awarded to the above identified employees. In addition, a promotion claim based on Littlejohn's promotion to store manager five months after Celestine's termination is obviously doomed as a terminated employee cannot be promoted.

Even if Celestine's remark to Wilson could be considered an application for the position awarded to Kevin Jones, RAC has articulated a legitimate nondiscriminatory reason that Jones was promoted to store manager rather than Celestine – that is, that he was more qualified that Celestine based upon his prior experience as a store manager at RAC.

To the extent that Celestine may challenge promotions of employees other than Kevin Jones, Brandon Wade, Robert Lewis and Lynn Littlejohn, he has not identified the employees sufficiently by name, date of promotion and position to which they were promoted. It is not sufficient at the summary judgment stage to argue that "and others" were promoted over him.

RAC's motion for summary judgment as to Celestine (doc. #56)  is due to be granted. A final judgment consistent with this memorandum of opinion will be entered simultaneously herewith.

As to the foregoing it is SO ORDERED this the 28th day of September, 2007.

_____
PAUL W. GREENE
CHIEF MAGISTRATE JUDGE