FILED

2007 Sep-28  PM 03:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
<u>EASTERN DIVISION</u>

| | |
|---|---|
| ALCURTIS CELESTINE, on behalf of himself and others similarly situated, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CIVIL ACTION NO. 03-PWG-0190-E |
| | ) |
| RENT-A-CENTER, INC., | ) ) |
| Defendant. | ) |

| | |
|---|---|
| CHRISTOPHER L. WOODS, on behalf of himself and others similarly situated, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CIVIL ACTION NO. 03-PWG-1101-E |
| | ) |
| RENT-A-CENTER, INC., | ) ) |
| Defendant. | ) |

<u>MEMORANDUM OF OPINION</u>

On May 12, 2003, Christopher L. Woods, an African American, filed this action against Rent-A-Center, Inc., hereinafter referred to as "RAC," alleging race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981. The parties have consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c) and LR 73.2.  This matter is before the court on RAC's motion for summary judgment.  (Doc. #62).

Summary judgment is appropriate only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  Rule 56, *Federal Rules of Civil Procedure*.  In making that assessment, the court must view the evidence in a light most favorable to the non-

moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his *prima facie* entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be `no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [Citation omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

898 F.2d at 1532.

The Eleventh Circuit has expressly rejected the notion that summary judgment should sparingly be used in employment discrimination cases because such cases involve issues of motivation and intent. See *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004). Rather, "the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is

to be placed on either side of the scale." 376 F.3d at 1086, quoting *Chapman v. AI Transport*, 229 F.3d 1012, 1026 (11th Cir. 2000).

The following relevant facts are undisputed or, if disputed, viewed in the light most favorable to Woods as the non-moving party. In April 1999 Woods was discharged from the Army as a First Lieutenant after serving five years. In September, 1999, Woods was hired as an account manager at store #440 in Oxford, Alabama. Account manager was the lowest level position at the store where Woods worked. Woods has a college degree.

Woods completed required Focus I Training on February 23, 2000. On May 20, 2000 Stephany Ball was promoted to Inside/Outside Assistant Manager ("I/O") at store #440.[1] In May 2000, Woods took the APT management test in order to become eligible for promotion to I/O Manager at RAC. The May 24, 2000 results of the APT indicated that Woods had "potential as an Inside/Outside Assistant Manager, with growth potential in the future."

On August 3, 2000, Aaron Roe transferred from the position of store manager at store #454 to the position of store manager at store #440. On August 5, 2000, Woods and John Roach were both promoted to I/O Manager at Store #440.[2]

---

[1]    In his response to RAC's statement of undisputed facts, Woods states that "Ms. Ball was already in a management trainee position and she was thereafter promoted again," citing to specific pages in Woods's deposition; (Doc. #72, p. 9, ¶ 17); however, those pages do not support this statement. Unless a statement is "uncontroverted," the court has gone to the specific citations to the record to verify the substance of the evidence or testimony. Unfortunately, the court has observed many instances in which Woods's citations do not support his statement or even an inference thereof. In some instances, the general subject matter of the statement was not discussed. Where a statement is unaccompanied by a citation to the record, the court has disregarded the statement unless the statement is specifically  "uncontroverted."

[2]    In responding to RAC's statement of undisputed facts, Woods asserts that "Mr. [Roach] was thereafter provided additional promotional opportunities greater than those provided to Mr. Woods." (Doc. #72, p. 9, ¶ 23); however, Woods does not identify those "additional promotional opportunities" and the citation to the record does not support this assertion.

On June 25, 2001, Woods was transferred to Store #1001 in Anniston as the I/O Manager. Woods did not complain about this transfer because of his good relationship with the store manager. Woods believed the transfer put him in a better situation at RAC. [3/]

On December 7, 2001, Woods was transferred to Store #1012 in Gadsden as the I/O Manager. Woods became the sixth employee at the store and was needed because Store #1012 had obtained numerous rental agreements and had acquired another store through a buyout justifying a sixth employee. Subsequently, the store began to lose rental agreements which required a return to five employees. Rather than laying off Woods, he was offered a temporary reclassification until an I/O position opened in the market closer to his home. Woods was told that he would be re-promoted to I/O when a position was available. [4/]  On March 9, 2002, he was reclassified as an Account Manager A and transferred to Store #446 in Anniston.

When the I/O position became available at Store #451 in Talladega  in May 2002, RAC offered the position to Woods. Woods initially declined the offer of promotion because he would

---

[3/]   In his statement of facts in dispute, Woods asserts that he was promoted to Assistant Store Manager in August of 2001, but was later demoted allegedly for "needs of the company and cost reasons." (Doc. #72, p. 13, ¶ 3). Woods's citations to the record do not support that he was promoted to assistant store manager in August of 2001. Woods remained at the Anniston store in August 2001. Woods testified that Bobby Hardin was the sales IO in the Anniston office and that he [Hardin] was either an EA (executive assistant) or IO but he did not know which. (Woods, 102-03). He testified that Bobby had to go to another store as an interim manager and that he [Woods] took over the sales IO position in his absence but "[i]t wasn't an actual promotion." (Woods, 114-115). The portion of the record cited by Wood actually refers to his tenure at the Gadsden store; however he was not transferred to Gadsden until December, 2001. (Woods, 121.) Woods complains that he was transferred from the Gadsden store for "needs of the company and cost reasons" with no other explanation; however, he testified in deposition that he was told by Regina Wilson, the Gadsden store manager, that "she couldn't house me. The store didn't make enough money to keep me, so she had to send me back to Anniston. She told me that I was going to be demoted, and she sent me back." (Woods, 130-31). Woods also testified that Wilson told him that he was sent down to her store as an account manager. (Woods, 132.)

[4/]    In his statement of facts in dispute, Woods states that after his demotion, a Caucasian employee was promoted into the assistant manager position that he was demoted from. (Doc. #72, p. 13-14, ¶ 4). Woods's deposition testimony was that when he left Anniston to go to Gadsden Tim French became the IO in Anniston. The record does not reflect that Woods was demoted when he left Anniston to go to Gadsden. (Woods, 124.) When he left Gadsden to go back to Anniston he was listed as account manager and "was demoted under the old pay scale." (Woods, 128.)

4

have been required him to sign an arbitration agreement.  Woods did not want to sign the arbitration agreement because he had a pending EEOC charge filed on May 15, 2002 alleging race discrimination in regard to his claims related to promotion and demotion.  RAC promoted Woods to the I/O position at Store #451 on May 27, 2002.[5]  RAC did not require Woods to sign an arbitration agreement in response to his expressed concerns.

On September 29, 2002, Woods was offered a promotion to executive assistant at store # 451 in Talladega.  He was also allowed to accept this promotion without executing an arbitration agreement.

In October 2002, Woods completed the CMI Competency Valuator, the management test needed to qualify for a promotion to a store manager position.  On October 2, 2002, Woods signed an acknowledgment that he understood that he was "eligible to be hired/promoted up to the level of Store Manager" and that he understood "that if a position [was] not currently available, [he] must continue performing in [his] current position to Rent-A Center's performance standards to be considered for promotion once a position [became] available."

On May 12, 2003, Woods filed this lawsuit.

In March 2004, Woods was offered the store manager position at Store #451.  Initially, Woods declined to accept the promotion because of his concern with respect to how the arbitration agreement would affect this litigation.  Woods was told that RAC would reword the arbitration

---

[5]      Woods states that he was transferred to the Talladega store with the understanding that he would be the assistant store manager there but that he was not promoted upon his arrival.  (Doc. #72, p. 14, ¶ 6).  This is inconsistent with the cited portion of his deposition wherein he testified that he was told that he was being sent from Gadsden to the **Anniston** store as an account manager and that he was "under the impression when [he] got [to the Anniston store] that he was going to be assistant manager.  (Woods, 130-32).  He testified that his transfer to **Talladega** "was a lateral transfer and then [he was] promoted."  (Woods, 142).  He testified that he refused the promotion on May 16, 2002 and that as far as he can remember that was the first day he heard about the offer.  (Woods, 145-46.)

agreement to carve out his current lawsuit.  Woods again refused the promotion because "[he] felt the store was being set up for failure, because [they] didn't have the personnel to succeed." (Woods, 226.)  At the time of the offer, stores #451, #639, and #303 were the lowest profit stores in the market of eight stores.  (Williams, 61-62, 131-33).  Store # 451 was also one employee below staffing. (Williams, 134.)  Kevin Nemitz was transferred to the Store Manager position at Store # 440 on April 10, 2004 from another store where he was store manager.[6]

In April 2004, Deitrich Williams became Market Manager for the area that included Woods's store.  Regional Director Roger Powell told  Williams  that Woods had a pending lawsuit against RAC but did not provide details.  He told her "This suit has nothing to do with us running our business."  (Williams, 194-97).  On December 27, 2004, John Means became Woods's store manager at store #451.  Williams testified that it was her impression that Means was aware of Woods's claims against the company although she had never informed him about the lawsuit. (Williams, 232-34.)

In December 2004, Williams told Will Stanton, RAC director of human resources, that she was considering terminating Woods in a couple of weeks due to poor performance.  (Williams 309-10).  Stanton told her to follow the proper coaching procedures – that is, to recover or follow up the points of the coaching form Woods was given in July 2004.  (Williams, 310, 318-19).[7]

---

[6]     Woods does not dispute that Nemitz was transferred from another store where he was store manager.  He states without any citation to support his position that Nemitz had been provided a Store Manager position which Woods had sought and been denied. (Doc. #72, p. 11, ¶ 49).

[7]     Woods refers to Williams "specifically targeting" him by copying file materials which was not done for others and by attempting to terminate Woods in December 2004.  (Wood's statement of disputed facts, doc. #72, pp. 18-19, ¶ 29).   Williams's deposition testimony  reflects that she had a copy of Woods's January 13, 2000 writeup in her store file because she maintained files on each store and that the files would include mostly information on managers of stores such as promotions, discipline and termination documents and Woods was acting manager of store #451 "for a good while."  (Williams 190-94).

In January 2005 Woods asked Means for permission to take off work on Saturday, January 29, to go for what Means understood to be an interview for another job.[8] Woods testified he asked Means for permission to leave work early to take a State exam.  (Woods, 200-02).  Means gave Woods permission.  Later Means discussed with Rodney Vaughn, a co-worker, his concerns about giving Woods permission to take off on a Saturday, which would cause the store to be short an employee on its busiest day, with only two other employees at work.[9]  Vaughn informed Williams that Means told Woods he could take off on Saturday to pursue another job.  Williams called Means and Means confirmed that he had approved the time off for Woods.  Williams instructed Means to tell Woods that he could not go to the interview on Saturday because it would leave only two employees in the store and that management would help him reschedule time off at another time for the interview. Williams did not speak directly to Woods about the request to miss work on January 29, 2005.  (Woods, 202; Williams, 235-36).

Williams understood from Means that Means told Woods he could not have Saturday off and would have to reschedule his appointment.  Williams testified that she did not understand that Means told Woods that he would be terminated if he left early on Saturday.  (Williams, 239).  On Saturday morning, Woods asked Means "Well is it still okay for me to go take the exam," and Means said "Yes" and asked if Woods was going to make it back to the store that day.  Woods said that he would do the best he could do but noted that the weather conditions were bad and said that he did not know how long it would take to complete the exam.  Means said "okay."  Woods worked until about noon on Saturday and went to take the exam.  On Saturday, around 11:15 a.m., Means called Williams and

---

[8]     Woods does not contest this statement.

[9]     When Woods first started working for RAC, the Oxford store #440 operated "on a regular basis" with two people off at the same time resulting in only three people being on duty. (Woods, 35-38).  There was no testimony that store #451 in Talladega operated similarly.

told her that Woods had just left work.[10/]  Between 4:00 and 5:00, Woods called the store and asked Means if he could come in on Monday because the exam took so long and the weather was bad. Means said "okay."   After consulting with her Regional Director Roger Powell and RAC's home office, Williams made the decision to terminate Woods's employment for insubordination and instructed Means to terminate Woods.[11/]  Woods reported to work on Monday and worked a full day. At the end of the day, Means told Woods that Williams wanted him gone and he was terminated. Means told Woods that he did not agree with the decision and said "it's not fair to you."[12/]  Woods was terminated on January 31, 2005 for insubordination.

Woods submitted as exhibits 17 charges of discrimination by RAC employees or former employees – 13 of which were filed in 1999. He also submitted as exhibits five complaints in lawsuits – two of which were filed by RAC employees or former employees who were the complainants in the submitted charges of discrimination. In addition, he submitted the affidavit of James Smelcher, Caucasian, who stated in pertinent part:

> I worked for [RAC] between 2000 and 2004.  I often heard members
> of management of [RAC] make many derogatory remarks about
> blacks.

---

[10/]   Although there is a disparity concerning the time Woods left (noon by Woods's account and 11:15 by RAC's account), both statements are uncontroverted for summary judgment purposes.

[11/]   Woods incorrectly states in his statement of disputed facts (doc. #72, p. 20, ¶ 38) that Williams admitted that Woods's termination was the only termination that she has been involved in as a Market Manager that was initiated by her rather than by the Store Manager.  Actually, she testified that she initiated the terminations of both Woods and James. (Williams, 112-14).

[12/]   Woods states in his disputed facts that "Means admitted that he could not deny thereafter telling Woods that he could still have the time off Saturday to take the State exam."  (Doc. #72, p. 19, ¶ 37).  Means actually testified that he could not recall ever telling Woods after the call with Williams that Woods could still have time off on Saturday. (Means, 105-09).  Means also testified that he told Woods "not to go to the appointment interview, and he could reschedule.  And I repeated the exact words on maybe three occasions to him throughout the week from the market manager."  (Means, 98).

> On one occasion, Dana Miller, the white store manager of the [RAC] store in Anniston, called me into his office and told me I needed to "talk more like a white man." He said I sounded like a black man on the phone to customers and that "is not what this company wanted." He showed me a picture from the [RAC] newsletter that had all white middle aged males in it and said this was the type of people the company liked. I heard Dana Miller on many occasions make racist jokes to other employees and management of [RAC].
>
> Black males did not get promoted like they should have been. On many occasions I saw black males passed over for management positions and the job given to a white male. I was put over Chris Woods, who had been an Account Manager since about 2003 or 2004, into a Credit Manager position even though I had less seniority and experience.

(Smelcher affidavit, p.2).[13]

In what he termed a statement of disputed facts, Woods includes a section entitled "Rent-A-Center's Management's Other Conduct and Words Showing Racial Bias" (doc. #72, pp. 22-25, ¶ 51-67) which is clearly intended to show a "culture of racial inequality" at RAC.[14] Woods relies upon the deposition testimony of Lawrence Kahlden, a Caucasian former market manager, to establish that RAC Regional Director Roger Estep made racially discriminatory comments. The statements not actually heard by Kahlden cannot be considered on summary judgment.[15] Kahlden also related two

---

[13]   RAC points out that Woods testified that he "had a pretty open relationship" with Dana Miller and that the transfer to Miller's store "was a better situation in my eyes." (Woods, 111). RAC also correctly points out that Woods has not asserted that Smelcher received a promotion that Woods should have received. (Doc. #76, page 15, ¶ 18-20).

[14]   The "culture of inequality" quotation comes from Woods's statement of disputed facts. (Doc. #72, p. 25, ¶ 66).

[15]   Although Woods implies that Estep used the word "nigger" among Caucasian people in Kahlden's presence, Kahlden's testimony clearly states that he heard this from RAC managers who had left RAC. ( Kahlden, 137). A statement allegedly made by Estep referring to a former regional director as "nigger" and "ignorant" or "stupid" was not made in Kahlden's presence but recounted to him by a former RAC manager. (Kahlden, 138-40). Another former RAC manager told Kahlden that Estep had told him several times to "get rid of Tasha, who was a black female, because they were in the country, and there were no black customers, and she was a female." (Kahlden, 62-63).

comments by Estep that he interpreted as derogatory references toward black store employees. After seeing two black employees in one store, Estep told Kahlden "You can look at that and tell that there ain't no back up." (Kahlden, 37-38). Kahlden asked Estep what he thought about a long time store manager named Booker Graham, an African American. Estep said "Well, he is not bad, but he is not someone me and you would want to shoot pool with." (Kahlden, 38-89). Although Woods asserts that he was informed by other RAC Caucasian management that Estep made racial comments from time to time, he testified that he never heard Estep make any racial comments. (Woods, 303). Woods testified that James Smelcher said that Estep used racial slurs, but Smelcher would not tell Woods what was allegedly said. Woods said Smelcher "just said they were racial[ly] discriminatory statements." (Woods, 306). Significantly, Smelcher's affidavit does not refer to Estep. Woods testified that Bobby Hardin told him that Estep said "stuff that [was] not appropriate" but did not state specifically what Estep said. (Woods, 308). When asked if Hardin used the term "racial," Woods stated "He indicated that it was something I wouldn't like. That's all. And I assumed it was racial. And I know it was safe to assume that, based on the way he was acting."(Woods, 309).

Woods seeks to introduce through the deposition testimony of William Augustus Roberts a racially derogatory statement made in 1999 by RAC President Dowell Arnett to Roberts. RAC filed a Motion to Strike the Deposition Testimony of Roberts. (Doc. # 77). For reasons stated, the motion is granted by separate order.

Woods testified that after he told RAC Manager Dana Miller that he wanted to be promoted Miller showed him a photograph of RAC executives and said "Do you look like any one of those?" When Woods responded "no," Miller said "Well, do you think you are going to be promoted up

there?" (Woods, 138-39). African American employee Alcurtis Celestine related a conversation that

he had with Caucasian Tim Phillips about the store manager's position:

> He was basically saying that, in so many words he was like, well –
> because we was still stuck on him being the store manager.  And he
> was, like, "Man," he was like, you know, "Who you is?  It's like a
> stumbling block for you." you know, like that.  "It's all about who
> you know."  He said "Who you is, is like a stumbling block." You
> know, that's basically how he left that.  It was like, "Wow."

> Q.     Did you consider that to be a racial slur?

> A.     Yes, because it don't matter who I am as long as I'm
> performing.

> Q.     Again, tell me what his exact words were that you considered
> to be a racial slur.

> A.     Who I am could be stumbling block. To me, that's a reason
> why I won't be able to get ahead in the company, because of
> the color, is the way I took it.  He's a young guy; he's a young
> white guy; and he's running the store.

> Q.     Again, his comment was, "Who you are could be a stumbling
> block"?

> A.     Yes.

(Celestine, 90-91).

In responding to defendant's motion for summary judgment, Woods identifies the following claims

as the claims he seeks to submit to a jury:[16]

> (A)     Whether Rent-A-Center discriminated against Chris Woods
> based on his race when it terminated him on January 31,
> 2005;

---

[16]     Any race discrimination claims based on transfers are abandoned as Woods did not respond to RAC's discussion of this claim. *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1325 (11th Cir. 2000).

(B)    Whether Rent-A-Center retaliated against Chris Woods for his protected activity when it terminated him on January 31, 2005;

(C)    Whether Rent-A-Center discriminated against Chris Woods based on his race when it demoted him from his assistant manager position; and,

(D)    Whether Rent-A-Center discriminated against Chris Woods based on his race when it did not promote him to Store Manager and/or other management positions provided at various times to the following persons and persons who had not complained of race discrimination: Aaron Roe, Stephanie Ball, Mr. Roche, Alton Heacock, Bobby Hardin, Kevin Jones, Tim French, Lynn Littlejohn, Dale Emmett and/or Don.

(Doc. # 72, pp. 1-2).

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer…to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000(e)-2(a)(1).  42 U.S.C. § 1981(a) provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Title VII and § 1981 claims are analyzed in the same manner.  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).[17]

---

[17]    A § 1981 action does not require compliance with Title VII's administrative machinery as a prerequisite to a cause of action. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459-61, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975).  A § 1981 claim which requires proof of intentional discrimination may also be brought against an employer that does not satisfy the mandatory/minimum 15 employees engaged in an industry affecting commerce as required by 42 U.S.C. § 2000-2(a); Id., 511 U.S. at 303, n.3, 114 S.Ct. 1515 n.3, 128 L.Ed.2d 274 n.3.

ANALYTICAL FRAMEWORK

Woods seeks to prove both his claims of race discrimination and retaliation with circumstantial evidence rather than direct evidence, thus invoking the burdenshifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under this framework, a plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *Combs v. Plantation Patterns*, 106 F.3d 1519 (11th Cir. 1997), *cert. denied*, 522 U.S. 1045 (1998). If he proves a *prima facie* case of discrimination, the burden shifts to the defendant employer to rebut the presumption of discrimination by articulating "a clear and reasonably specific" legitimate, non-discriminatory basis for its actions." *Burdine*, 450 U.S. at 254-55. An employer's burden to articulate a non-discriminatory reason for failing to promote an employee is a burden of production, not of persuasion. *Burdine*, 450 U.S. at 254. Because this burden involves no credibility determination, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993), it is an "exceedingly light" burden. *Meeks v. Computer Associates, Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994); *Perryman v. Johnson Prod. Co.*, 698 F.2d 1138, 1141 (11th Cir.1983).

After the employer discharges its burden, the burden shifts back to the plaintiff to show that the reason offered by the employer was a pretext for discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 804. At the pretext stage, the court's concern is not whether the employment decisions are prudent or fair but whether unlawful discriminatory animus motivates the challenged employment decision. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir.1999), *cert. denied*, 529 U.S. 1109 (2000). To survive summary judgment, the employee must come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given

by the employer were not its true reasons, but were a pretext for discrimination. *Chapman v. AI Transport,* 229 F.3d 1012, 1024 (11th Cir. 2000).  This evidence must reveal "such weaknesses, implausibilities, inconsistencies, incoherences or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Cooper v. Southern Co.,* 390 F.3d 695, 725 (11th Cir.2004), *cert. denied*, 546 U.S. 960 (2005).  The plaintiff may not simply quarrel with the wisdom of the reason proffered "but must meet it head on and rebut it." *Chapman* , 229 F.3d at 1030.  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. " *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000).

    (A)    Whether Rent-A-Center discriminated against Chris Woods
            <u>based on his race when it terminated him on January 31, 2005</u>

To establish a *prima facie* case of race discrimination, a plaintiff must show:

> (1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job.

*Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  See also, *Burke-Fowler v. Orange County, Fla.*,  447 F.3d 1319, 1323 (11th Cir. 2006).

RAC argues that Woods cannot establish a *prima facie* case because there is no substantial evidence that RAC treated similarly situated white employees more favorably.  Woods argues that he has shown that he was treated differently than Caucasians Edwin, Katrinka, Johnny Mathis, Crystal Dunn, Brandon Wade, "and several others."

> "In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v.*

14

> *Bessemer Carraway Med. Ctr.,* 137 F.3d 1306, 1311 (11th Cir.)
> (quoting *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)),
> *opinion modified by* 151 F.3d 1321 (11th Cir. 1998). "The most
> important factors in the disciplinary context ... are the nature of the
> offenses committed and the nature of the punishments imposed." *Id*.
> (citations and quotations omitted). In order to satisfy the similar
> offenses prong, the comparator's misconduct must be nearly identical
> to the plaintiff's in order "to prevent courts from second-guessing
> employers' reasonable decisions and confusing apples with oranges."
> *See Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999)
> (citation omitted); *see also Dartmouth Review v. Dartmouth College*,
> 889 F.2d 13, 19 (1st Cir. 1989) ("Exact correlation is neither likely nor
> necessary, but the cases must be fair congeners. In other words,
> apples should be compared to apples.").

*Silvera v. Orange County School Bd*., 244 F.3d 1253, 1259 (11th Cir. 2001), *cert. denied,* 534 U.S.

976 (2001).

In his statement of disputed facts (doc. # 72, pp. 20-22, ¶41, 42, 44, 46-48), Woods identifies

various Caucasian employees as comparators allegedly treated more favorably. Edwin was absent

and late on multiple occasions. Edwin was being coached for tardiness and excessive absences when

he left and did not return. (Williams, 103-05). Katrinka was terminated because of an inventory

control issue after receiving an earlier coaching form for inventory control problems. (Williams,

105-08). Johnny Mathis was written up for not making the proper cash drops into the safe, resulting

in more than $100 being left in the drawer, and for "not meeting standard deliveries." (Williams,

158-59). Crystal Dunn was put on a coaching form for allegedly letting her husband ride in the

company truck while she was driving. (Williams, 166-67). John Day, was counseled twice for not

doing completing inventories before he left the company. (Williams, 168-69). Brandon James Wade

was a "no-call, no-show" on a Saturday. He was not terminated after being caught attending a

parade. (Celestine, 63-67). Despite Woods's characterization of their actions as violations of direct

orders, Edwin, Katrinka, Mathis, Dunn, and Day violated company procedure – not  direct orders.

15

Woods was terminated for insubordination for violating a direct order – leaving early after being told he could not do so. These employees are not similarly situated in light of the clear qualitative difference in their conduct and Woods's conduct. Wade is not similarly situated both because he did not violate a direct order and because he worked for a different store manager (B.G. Simmons) and market manager (Regina Wilson) at the time of his "no-call, no show." *Bessemer v. Carraway Medical Center*, 137 F.3d 1306, 1312 n.7 (11th Cir.), *opinion modified by*, 151 F.3d 1321 (11th Cir. 1998)("Different supervisors may have different management styles that – while not determinative – could account for the disparate disciplinary treatment that employees experience."); *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989)("Courts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis.")

The ambiguous "several others" Woods refers to as comparators are apparently employees who were allowed to be off on a Saturday. Williams testified that she allowed a man who was in a wedding party to be off on a Saturday after he asked her a couple of months in advance. (Williams, 96). Employees who were sick were allowed off on Saturday. (Williams, 98). Johnny Mathis was allowed to be out on a Saturday after the death of his mother and the hospitalization of his father. (Williams, 98). Regina [Wilson] was allowed to be off on a Saturday to go to a family function after asking "in plenty of time;" however, she was "not missing any coworkers at the time." (Williams, 98).[18] In each case, the employee had permission to be off on a Saturday. In Woods's case, Williams directed Means to revoke the earlier permission and she understood that Means had advised Woods of that decision. "If a plaintiff fails to show the existence of a similarly situated

---

[18] Woods testified that previous supervisors, Tracy Carr, Alton Heacock and Brian (last name unknown), had allowed him [Woods] to be absent on Saturdays for deaths in the family, to spend time with family, when the kids needed clothes. (Woods, 205-08). The fact that other managers had allowed Woods to be absent on a Saturday is irrelevant to Williams's termination of Woods based on insubordination for leaving early when he was told that he was **not** allowed to do so.

employee, summary judgment is appropriate where no other evidence of discrimination is present." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997).

RAC has proffered a legitimate, nondiscriminatory reason for Woods's termination. Specifically, RAC states that Woods was terminated for insubordination based on the decision of Williams when she was told that Woods had left the store on a Saturday after Means had told him that he was not allowed to leave.

Woods argues that the reason offered for his termination is pretext for discrimination even if he violated Williams's direct order because she did not terminate other similarly situated Caucasian persons who had violated her direct orders. As previously noted, the identified employees were not similarly situated because they did not, as argued by Woods, violate direct orders but only company policy or procedure – for which they were coached or counseled.

Woods further argues that RAC must be responsible if it is found that Means did not advise Williams that he had continued to agree that Woods could leave early that Saturday. "An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." *Damon,* 196 F.3d at 1363 n. 3.  In determining whether Woods established a factual question on the issue of pretext, the issue is whether Williams believed that Means told Woods he could not leave early, not whether the allegation was  in fact true. See *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir.1991).  Williams instructed Means to tell Woods that he could not take off that Saturday after all.  Williams understood from Means that he told Woods that he could not take off that Saturday.  It is undisputed that Woods left early. Williams made the decision to terminate Woods because she believed he disobeyed a direct order – that is, that he left early after being told he could not do so. Even if Means "lied through his

teeth"[19] Woods has presented no evidence to indicate that Williams could have known that Means lied.  "An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct." *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999), *cert. denied,* 529 U.S. 1109 (2000).  See also *Sempier v. Johnson and Higgins*, 45 F.3d 724, 731 (3d Cir. 1995) ("pretext is not demonstrated by showing simply that the employer was mistaken."), *cert. denied,* 515 U.S. 1159 (1995).  Woods  has  failed to present sufficient evidence to permit a reasonable fact finder to conclude that the reason given by RAC was not the real reason for his termination.

Woods argues that other evidence of pretext included the evidence of racial slurs and racial bias.  Woods apparently relies upon  the alleged "culture of inequality at RAC."  Although comments unrelated to a termination decision may contribute to a circumstantial case for pretext, see *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286 (11th Cir. 1998), such evidence will usually not be sufficient absent some additional evidence supporting a finding of pretext. See *Rojas v. Florida*, 285 F.3d 1339, 1443 (11th Cir. 2002).  Here, there is no evidence that either Estep, Arnette, Miller or Phillips played any roles in any employment decisions relating to Woods.  There is no evidence that Williams, the decision maker, was aware of any  racially discriminatory comments allegedly made by Estep,  Arnette,  Miller or  Phillips.  There is no evidence that Williams ever made any racially discriminatory comments.

Woods has not specifically argued that the EEOC charges and complaints in other lawsuits against RAC alleging race discrimination are evidence of pretext.  In any event, the **charges and complaints** are not admissible to establish pretext.  In the Eleventh Circuit, EEOC **determinations**

---

[19]        See *Elrod*, 939 F.2d at 1469.

are generally admissible in bench trials but not in jury trials. See, *Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1554 (11th Cir. 1995) *citing, Barfield v. Orange County*, 911 F.2d 644, 649 (11th Cir.1990) (listing cases), *cert. denied*, 500 U.S. 954 (1991).  In *Walker*, the court noted that "Administrative findings regarding claims of discrimination are admissible in a trial de novo under Federal Rules of Evidence 803(8)(C), the public records and investigatory file exception to the hearsay rule. *Chandler v. Roudebush*, 425 U.S. 840, 863 n. 39, 96 S.Ct. 1949, 1960-61 n. 39, 48 L.Ed.2d 416 (1976)."  *Walker*, 53 F.3d at 1554, n. 7   Even though an EEOC determination is admissible in a bench trial,  the court is not required to defer or make reference to the EEOC determination nor is it required to address EEOC findings; rather, the court must conduct a *de novo* review of the claims. *Moore v. Devine,* 767 F.2d 1541, 1549-51 (11th Cir.1985), *modified on reh'g,* 780 F.2d 1559, 1560 (11th Cir.1986) (clarifying that EEOC determinations for federal employees are different and may be binding on the courts).  The EEOC findings regarding race discrimination claims are not in the record.

Woods has not raised a genuine issue of material fact regarding his Title VII and § 1981 claims of discrimination.

_____(B)    Whether Rent-A-Center retaliated against Chris Woods for his
             protected activity when it terminated him on January 31, 2005

To establish a *prima facie* case of retaliation, plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression. *Hurlbert v. St. Mary's Health Care Sys., Inc.,* 439 F.3d 1286, 1297 (11th Cir.2006); *Cooper v. Southern Company*, 390 F.3d 695, 740 (11th Cir. 2004), *cert. denied*, 546 U.S. 960 (2005); *Weeks v. Harden Mfg. Corp.,* 291 F.3d 1307, 1311 (11th

Cir.2002); *Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 587 (11th Cir.2000), *cert. denied*, 531

U.S. 1076 (2001); *Meeks v. Computer Assocs.*, 15 F.3d 1013, 1021 (11th Cir. 1994).[20]

Woods engaged in a protected activity when he filed his EEOC charge.  *Bass v. Bd. of County

Commr's of Orange County, Fla.*, 256 F.3d 1095, 1117 (11th Cir.2001); *Gupta, supra; Berman v.

Orkin Exterminating Co.*, 160 F.3d 697, 702 (11th Cir.1998).  The filing of this lawsuit was also a

protected activity.  *Everson v. Coca-Cola*, 2007 WL 2088839 (11th Cir. 2007)("it was the filing of

[plaintiff's] lawsuit that qualified as protected activity"), citing *Donnellon v. Fruehauf Corp.*, 794

F.2d 598, 601 (11th Cir. 1986)(holding the **filing** of a EEOC complaint constitutes a protected

activity).  Because Woods was terminated, he has also established that he suffered an adverse

employment action.

RAC argues that Woods has failed to show a causal connection between his termination and

any protected expression.  To establish a causal connection, a plaintiff must show that the decision-

makers were aware of the protected conduct [and] that the protected activity and the adverse

employment action were not wholly unrelated."  *Gupta,* 212 F.3d at 590 (internal quotations and

citation omitted). See also, *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)(stating

the temporal proximity between the employer's knowledge of protected activity and an adverse

employment action must be "very close" to be sufficient evidence in itself to establish a *prima facie*

case).  Woods cannot satisfy the causal relation requirement of a retaliation claim because he has

---

[20]     In *Burlington Northern & Santa Fe Railway Co.*, __ U.S. __, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), the
Supreme Court held that "the scope of [Title VII's] anti-retaliation provision extends beyond workplace-related
or employment-related retaliatory acts and harm" and therefore "is not limited to discriminatory actions that
affect the terms and conditions of employment." 126 S.Ct. at 2412-14.  Rather than being required to show an
adverse employment action, a plaintiff must now show only that "a reasonable employee would have found the
challenged action materially adverse, which in this context means it well might have 'dissuaded a reasonable
worker from making or supporting a charge of discrimination.'" *Id.* at 2415 (internal citations omitted.)

failed to establish the requisite temporal proximity of knowledge of the protected activity and his termination.

While Williams, the decisionmaker, learned about this lawsuit in April 2004 when she became market manager in Woods's market, Woods was not terminated until more than 9 months later.[21] Woods filed his EEOC charge on May 15, 2002.[22] His termination was more than two and a half years after the charge was filed. He filed this lawsuit on May 12, 2003. His termination was more than one and a half years after this lawsuit was filed. Regardless of whether the time span between the protected activity is viewed as nine months (Williams's knowledge of the filing of this lawsuit), a year and a half (the filing of this lawsuit), or two and a half years (the filing of the EEOC charge), the proximity between the protected activity and Woods's termination is insufficient to create a genuine issue of fact as to causal connection. *See*, *Clark County School Dist.,* 532 U.S. at 273 (three to four months is insufficient to show causal connection); *Higdon v. Jackson*, 393 F.3d 1211, 1220 -21 (11th Cir. 2004) (a three month delay was insufficient to establish that the protected expression and the adverse action were causally related, *citing Clark County School Dist. v. Breeden, supra*); *Wascura v. City of South Miami,* 257 F.3d 1238, 1248 (11th Cir.2001) (in the absence of any other evidence of causation, a three and one-half month proximity between a protected activity and an adverse employment action is insufficient to create a jury issue on causation); *see also*, *Drago v. Jenne,* 453 F.3d 1301, 1307-08 (11th Cir. 2006) ("We are not persuaded that three months (only two weeks less than the time we discussed in *Wascura*) is sufficiently proximate to show causation.").

---

[21]   RAC offered Woods a promotion to store manager (which he refused) in March 2004 prior to Williams becoming his Market Manager. Clearly, management at RAC were aware of both his EEOC charge and this lawsuit when they offered him the promotion.

[22]   The date that the EEOC charge was dismissed does not qualify as "protected activity" – the key date is the date that the charge was filed. See, *Everson v. Coca-Cola*, 2007 WL 2088839 (11th Cir. 2007); *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1986).

Because Woods has failed to establish a *prima facie* case of retaliation, further analysis on the retaliation claim is unnecessary.[23]

 (C) Whether Rent-A-Center discriminated against Chris Woods based on his race when it demoted him from his assistant manager position [in Spring 2002]

  RAC does not argue that Woods has failed to establish a *prima facie* case with respect to this claim. Rather, RAC argues that it had a legitimate non-discriminatory reason for reclassifying Woods from I/O to Account Manager A on March 9, 2002. RAC argues, and it is undisputed, that after Woods's transfer to store #1012, the store began to lose rental agreements requiring a cutback in staff to five employees. It is also undisputed that when Woods was transferred to store, he was the sixth employee. Rather than laying off Woods, he was offered a temporary reclassification until an I/O position opened in the market closer to his home. He was told that he would be re-promoted to I/O as soon as a position was available. He was offered the I/O position at store #451 in May 2002 when it became available.

  With respect to this claim, Woods states:

> For the same reasons as those noted above, Plaintiff Woods' claim for his Spring, 2002 demotion are also inappropriate for summary judgment. Defendant's alleged justifications for why one store had

---

[23] Woods failed to address the causal connection issue. In claiming pretext he has relied upon the same evidence considered above with respect to comparators; however, he added two additional comparators, Harold Lipscomb and Lewis Forquette. Harold Lipscomb, an African American, was demoted from credit I/O to account manager for poor performance after receiving a write up previously being for poor credit practices. (Williams, 66-71). Lipscomb was also given three days off, one of which was a Saturday, when "his mother [was] missing in the hurricane in New Orleans. (Williams, 99). Lewis Forquette, an African American, was written up for not verifying order forms which resulted in charge-offs. (Williams 143-44, 155, 162). Woods stated in his statement of undisputed facts that Lipscomb had not complained of discrimination at RAC. (Doc. #72, p.21, ¶ 43; Williams, 102). While there was no similar assertion with regard to Forquette (doc #72, p.21, ¶ 45), that is nevertheless the apparent contention of Woods. As with the other comparators, Lipscomb and Forquette are not similarly situated because there is no evidence that either violated a direct order. Woods has failed to establish that the articulated reason for his discharge was pretext for retaliation based on the alleged comparators. In the absence of any additional argument with respect to the claim that the alleged racial slurs and comments and "culture of inequality" are evidence of pretext, such allegations fail for the reason previously expressed.

22

> to reduce employees do not support the grant of summary judgment as to why Mr. Woods was the employee selected for demotion or why Mr. Woods was not transferred to another store in the same position as he had been in.

(Doc. #72, p. 34).

Woods was the sixth employee at the store.  He has offered no reason to suggest that it was race which motivated his selection as the person for demotion/temporary re-classification.  Woods has not identified another store which had an I/O vacancy in March 2002.  To the extent Woods relies on the same evidence of pretext previously found insufficient, it is clear that Woods has failed to carry his burden of presenting evidence that the articulated reason was a pretext for race discrimination.

> (D)     Whether Rent-A-Center discriminated against Chris Woods based on his race when it did not promote him to Store Manager and/or other management positions provided at various times to the following persons and persons who had not complained of race discrimination: Aaron Roe, Stephanie Ball, Mr. Roche, Alton Heacock, Bobby Hardin, Kevin Jones, Tim French, Lynn Littlejohn, Dale Emmett and/or Don.

A plaintiff may establish a *prima facie* case of promotion discrimination by showing that: (1) he is a member of a protected minority; (2) he was qualified and applied for the promotion; (3) he was rejected despite these qualifications; and (4) the position was filled by someone outside the protected minority.  *Vessels v. Atlanta Independent School System,* 408 F.3d 763, 768 (11th Cir. 2005); *Walker v. Mortham,* 158 F.3d 1177, 1185-87 (11th Cir.1998).  To demonstrate that he was qualified for the position, a Title VII plaintiff need only show that he satisfied an employer's objective qualifications.  *Vessels ,* 408 F.3d at 769.  A  plaintiff is not required to prove as part of his *prima facie* case that he is more qualified than the successful applicant.  *Walker*, 158 F.3d at

1189, relying on *Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

Stephany Ball

RAC argues that Woods has not shown a *prima facie* case because  there is no evidence that Woods applied or even communicated to the store manager his interest in receiving the position to which Ball was promoted on May 20, 2000.  Woods simply did not respond to this contention.

RAC also argued that Woods has not shown a *prima facie* case because be was not qualified for the promotion that Ball received because he had not received the scores from the APT test.  In response to this argument, Woods contends that RAC's promotion test was invalid and racially-discriminatory.  Woods has offered no evidence to support his contention.  Moreover, he scored well on the test and was promoted to I/O just ten weeks after Ball.  Because Woods has failed to establish that he was qualified for and applied for the promotion received by Ball, he has failed to establish a *prima facie* case of race discrimination.

John Roach

RAC argues that Woods cannot establish a *prima facie* case with respect to the promotion of Roach to I/O at store #440 on August 5, 2000 because Woods was promoted to the same position at the same store on the same day.  Woods does not address this argument but "contends that Mr. Roach was promoted beyond that position."  In its reply brief, RAC refers to Woods's "moving target" approach and argues that Woods has failed to identify what particular promotion he claims was discriminatory.[24]  By failing to identify  the specific promotion and by failing to present

---

[24] Woods may not amend his complaint through argument in a brief opposing summary judgment.  *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004); *Austin v. City of Montgomery,* 196 Fed.Appx. 747, 753 (11th Cir. 2006).

evidence that he applied for the promotion "beyond," Woods has failed to establish a *prima facie* case of discrimination with respect to promotions received by Roach "beyond" the August 5, 2000 promotion.

Aaron Roe

RAC argues that Roe was not promoted in August 2000 but rather was transferred to the store manager position at store #440 in Oxford. RAC further argues that the promotion claim as it relates to Roe is untimely. Woods has not responded to either argument. Woods has abandoned any claim related to Roe. *Coalition for the Abolition of Marijuana Prohibition, supra.*

Kevin Nemitz

RAC argues that Nemitz was a store manager at another store when he was transferred to the store manager position at store #440 on April 10, 2004 and was more qualified than Woods who was an assistant store manager at the time. RAC further argues that because Woods had refused a store manager promotion on March 26, 2004 Woods cannot establish a *prima facie* case of race discrimination based on Nemitz's transfer. Woods does not respond to the argument that Nemitz was not promoted but was transferred. Instead, he argues that " Nemitz was offered the Store Manager position in the better performing and better equipped Store that was not offered to Woods. As such, it is of no avail to Defendant that it had previously offered Plaintiff Woods the manager position at a bottom-performing store with staffing problems that was destined to fail."(Doc. #72, p. 33). Because the position was a transfer rather than promotion for Nemitz, Woods has failed to establish a *prima facie* case for race discrimination. Moreover, assuming that he did establish a *prima facie* case, Woods has failed to rebut the articulated legitimate, non-discriminatory reason for Nemitz's placement in the position – that is, the fact that Nemitz was more qualified.

Additional comparators identified by Woods

In his response to RAC's motion for summary judgment, Woods argues that RAC did not address his "claims that he was discriminatorily denied promotional opportunity provided to Caucasians Alton Heacock, Bobby Hardin, Kevin Jones, Tim French, Lynn Littlejohn, Dale Emmett, or Don (last name unknown)" In his brief, Woods does not identify the promotions (such as, by date, title, and store number) that he states these comparators received over him and he does not address his qualifications for each promotion.

RAC addressed allegations related to Heacock and "Don" in its brief in support of its motion for summary judgment. (Doc. # 63, p. 21, footnote 9). Specifically, RAC argued that Heacock was promoted to store manager at store #451 in August 2002, prior to Woods's completion of the requisite CMI in October 2002 and that Woods was thus not qualified for the store manager position in August 2002. Woods did not respond to this assertion.

RAC argued that it was unclear who "Don (last name unknown) "was and it was unclear what "assistant market manager" position Woods was referring to as Regina Wilson, Wood's Market Manager from 1999-2002, testified that she never had an assistant. (Wilson declaration, ¶ 9).

According to RAC, they have no record of an employee by the name of "Dale Emmett." (Doc. # 76, p. 53, footnote 18). In his deposition testimony, Woods did not identify "Dale Emmett" as an employee who received a promotion to which Woods believed he was entitled. The testimony related to the otherwise unknown "Dale Emmett" came during questioning related to whether Woods had used the computer vacancy process to apply for jobs. Woods testified that he applied online for the store manager position at store #1001 but Williams told him that she had not received the application. When he resubmitted the application, Williams told him that the vacancy was already

taken.  He was asked "Do you know who took that vacancy?" to which he replied, "Dale Emmett, a white guy." (Woods, 224).

In the context of discussing "bias" in management, Woods testified that he told Alton Heacock that he did not feel that Lynn Littlejohn should be have been promoted to "salesperson" because Woods had been at the company longer.  Woods also testified that he did not recall if Littlejohn had been promoted from sales to executive assistant.   (Woods, 193-97).

With regard to French, Hardin and Jones, there is nothing in the record to even remotely suggest that French, Hardin and/or Jones received a promotion for which Woods applied.  Woods testified that Tim French replaced him as credit IO when he left Anniston to go to Gadsden .  When Woods left Gadsden, his old position at Anniston was no longer available as it had been filled by French. (Woods, 169-74).

Woods  testified with regard to Bobby Hardin:

> Q.   During the time that you were in the Anniston store, were there any promotion opportunities that you were passed over for?
>
> A.   There may have been cases where people would get promoted in other stores, but I can't recall right now.  But in that particular store, I was the – I think Bobby had to go to another store as an interim manager, so I took the sales IO position while he was gone, in his absence.  I was the sales IO at the time. It wasn't an actual promotion.  It was just a transition, basically."

(Woods, 114-15).

With regard to Kevin Jones, Woods testified that "Kevin" replaced Dana Miller at the Anniston store when Miller was fired. (Woods, 111-114).  Woods testified that he knew Jones prior to his replacing Miller because when Jones worked at #1001 in Anniston as the store manager,

Woods who was at the Oxford store would pick up merchandise at the Anniston store and see Jones. (Woods, 116-17). There is nothing within Woods's deposition testimony to support his assertion that either Hardin or Jones were improperly promoted over him. Woods has failed to state a *prima facie* case for race discrimination in the promotion of Heacock, Hardin, Jones, French, Littlejohn, Emmett, and "Don (la st name unknown)."

RAC's motion for summary judgment as to Woods (doc. #62) is due to be granted. A final judgment consistent with this memorandum of opinion will be entered simultaneously herewith.

As to the foregoing it is SO ORDERED this the 28th day of September, 2007.

_____

PAUL W. GREENE
CHIEF MAGISTRATE JUDGE